UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:11-CV-00039-TBR

DAX R. WOMACK                                                        Plaintiff

v.

MATT CONLEY;
STEPHANIE CONLEY;
CONNIE KNIGHT;
ROBERT SHOULTZ;
JASON KIRK;
SCOTT INGRAM;
DAVID CRAFTON;                                                     Defendants


<u>**MEMORANDUM OPINION**</u>

This matter is before the Court upon Defendant Connie Knight's Motion for Summary Judgment. (Docket No. 83.) Plaintiff has responded. (Docket No. 98.) Defendant Knight has replied. (Docket No. 109.) This matter is now fully briefed and ripe for adjudication. For the following reasons, the Court will **GRANT** Defendant Knight's Motion for Summary Judgment.

Defendants, David Crafton and Scott Ingram, also move for Summary Judgment. (Docket No. 86.) Plaintiff has responded. (Docket No. 98.) Defendants Crafton and Ingram have replied. (Docket No. 110.) This matter is now fully briefed and ripe for adjudication. For the following reasons, the Court will **GRANT** Defendants David Crafton and Scott Ingram's Motion for Summary Judgment.

Defendants, Kentucky State Police Captain Robert Shoultz and Kentucky State Police Sergeant Jason Kirk, move for Summary Judgment. (Docket No. 87.) Plaintiff has responded. (Docket No. 98.) Defendants Shoultz and Kirk have replied. (Docket No. 112.) This matter is now fully briefed and ripe for adjudication. For the following reasons, the Court will **GRANT** Defendants Shoultz and Kirk's Motion for Summary Judgment.

Defendant Matt Conley moves for Summary Judgment. (Docket No. 89.) Plaintiff has responded. (Docket No. 98.) Defendant Matt Conley has replied. (Docket No. 108.) This matter is now fully briefed and ripe for adjudication. For the following reasons, the Court will **GRANT** Defendant Matt Conley's Motion for Summary Judgment.

Defendant Stephanie Conley moves for Summary Judgment on the remaining state law claim of defamation. (Docket No. 90.) Plaintiff has responded. (Docket No. 98.) Defendant Stephanie Conley has replied. (Docket No. 111.) This matter is now fully briefed and ripe for adjudication. For the following reasons, the Court will **GRANT** Defendant Stephanie Conley's Motion for Summary Judgment.

## BACKGROUND

The following are the background facts concerning this matter. Since this is a summary judgment motion, the Court resolves all ambiguities and draws all reasonable inferences against the moving parties. If there is a genuine dispute of material fact, the

Court will note it. If one of the parties assert a particular fact, and the opposing parties don't dispute it, the Court has assumed there is no genuine dispute as to that fact.

I.   <u>Overview</u>

Dax R. Womack ("Plaintiff") filed the Complaint in this action on April 1, 2011. (Docket No. 1.) Plaintiff's claims all arise out of an alleged investigation by the Kentucky State Police, Plaintiff's subsequent arrest and trial, and alleged withholding of exculpatory evidence by the Defendants. As confirmed by Plaintiff's proposed jury instructions, (Docket No. 168), and Plaintiff's response to the Court's Order at Docket No. 179, (Docket No. 181), the following claims remain:

1. Civil Conspiracy pursuant to 42 U.S.C. 1983 against all Defendants, except Stephanie Conley.

2. Fourth Amendment unreasonable entry/search against Connie Knight, Matt Conley, and Scott Ingram.

3. Fourth Amendment unreasonable seizure/arrest against Connie Knight, Matt Conley, and Scott Ingram.

4. Fifth and Fourteenth Amendment deliberately concealing exculpatory evidence, depriving Plaintiff of his right to a fair trial against Robert Shoultz, Jason Kirk, and Matt Conley.

5. Fourth Amendment deliberately concealing exculpatory evidence, continuing the pre-trial deprivation of liberty by loss of freedom of actions due to pending criminal charges against Robert Shoultz, Jason Kirk, and Matt Conley.

6. Supervisory liability under 42 U.S.C. 1983 against Robert Shoultz and Jason Kirk, as Matt Conley's supervisors.

7. Malicious prosecution against Matt Conley.

8. Defamation by Slander against Stephanie Conley.

A brief overview is appropriate. Defendants assert that Connie Knight, the mother of a client Plaintiff was defending and who occasionally met with Plaintiff during this representation, came to the police claiming that Plaintiff was attempting to use her to buy drugs. Law enforcement equipped her with audio and video equipment in order to verify and investigate these claims. Defendants utilized a "reverse-buy"[1] operation where Knight would be provided with the drugs allegedly requested by Plaintiff and Knight was instructed to go into Plaintiff's office while being wired with both audio and video. Upon her entrance into the office, the parties' stories significantly diverge.

Defendants claim that Knight gave Plaintiff the drugs, which he then put in his middle desk drawer. On the other hand, Plaintiff claims that the drugs were thrown on his desk while his back was turned at the instruction of Defendants and in furtherance of a conspiracy against him.[2] Immediately thereafter, two Defendants—Matt Conley and Scott Ingram—entered the office and a peaceful arrest occurred. The Court has reviewed the video and audio of the incident and notes it does not conclusively support

---

[1] "A reverse-buy is simply a transaction in which the police supply drugs to a confidential informant, who then sells the drugs to the suspect." (Docket No. 89, Page 4.)

[2] The Court notes that Plaintiff's apparent position that the drugs were on his desk is somewhat different than what Zack Womack (his father) testified to at the grand jury proceeding when he stated the drugs were in an open drawer.

either side's story. Ultimately, Plaintiff was charged with both a felony and a misdemeanor offense.

This action involves several Defendants: Matt Conley, Robert Shoultz, Jason Kirk, Scott Ingram, David Crafton, Connie Knight, and Stephanie Conley. Other than Stephanie Conley, Plaintiff claims all of these Defendants were involved in a conspiracy to frame him by sending Connie Knight into his office to plant narcotics. A brief description of each of these Defendants and their connection to this investigation is appropriate.

Matt Conley, a Kentucky State Police ("KSP") officer at Post 16, was primarily responsible for this investigation. Robert Shoultz has been Captain at Post 16 since September 2009. Jason Kirk was a Sergeant at Post 16 at the time of the alleged investigation into Plaintiff. Both Shoultz and Kirk were Conley's supervisors and frequently discussed and were kept abreast on this ongoing investigation

Connie Knight was the KSP's confidential informant in this investigation. She was also the mother of a defendant Plaintiff represented and appears to have been in semi-frequent contact with Plaintiff about her son's representation. She alleged that Plaintiff had, and was continuing to try, to use her to acquire illegal drugs under the guise that it was part of an effort to become a confidential informant for law enforcement. Essentially she claims Plaintiff led her to believe that the purchasing of these drugs was under the authority of law enforcement. Plaintiff denies that he used Knight to purchase drugs for his own use. Plaintiff asserts Defendants attempted to plant the drugs at Plaintiff's office and wrongfully prosecuted him.

Scott Ingram was a Deputy at Daviess County Sheriff's Department. David Crafton was a Deputy at Henderson County Sheriff's Department. Ingram and Crafton did not work for the KSP at the time of the investigation. Ingram was involved in the actual arrest of Plaintiff. Crafton was a contact point for Matt Conley to determine if Plaintiff had contacted the Sheriff's Department regarding Connie Knight.

Stephanie Conley is Matt Conley's wife. Based on her filing of a bar complaint and alleged conversations with one of Plaintiff's clients, Plaintiff has filed claims of defamation against her.

II.    Incidents Leading Up to Arrest

Although the investigation was done by the KSP, allegedly the initial information of Plaintiff's alleged drug involvement did not originate with the KSP. In March of 2010, an informant named "C.B." told Preston Herndon—a narcotics detective with the Henderson City Police Department—that Plaintiff was using Connie Knight to purchase drugs. (Docket No. 89, Page 1.) Herndon contacted KSP Post 16 about the case. C.B. and Knight also reached out to Conley at the KSP concerning the case.[3] Ultimately, Conley invited Knight to come to KSP Post 16 and be interviewed. Knight came in to be interviewed.

Knight's story was that originally she asked Plaintiff if assisting law enforcement in making drug buys would help her son. In response, Plaintiff stated buying prescription medication for law enforcement was the "only hope she had in helping her son." (Docket No. 87-6, Page 7.) Knight stated she then purchased drugs

---

[3] It is unclear whether C.B. and Knight did this on their own or at the prompting of Preston Herndon.

for Plaintiff under the impression she was doing it for law enforcement. As time went by, she became concerned she had been used to illegally purchase prescription narcotics. This concern is why she says she ultimately decided to report this behavior.

Conley states he did not initially believe these allegations.[4] Nevertheless, he was required to investigate them. Conley contacted David Crafton, a Deputy at Henderson County Sheriff's Department, and was told no member of his agency had been in contact with Plaintiff. Conley also contacted Henderson County Commonwealth Attorney Bill Markwell and received permission to conduct a reverse narcotics drug investigation if necessary. Conley then called Knight and requested she come to KSP Post 16 to become a confidential informant.

On April 1, 2010, Connie Knight came to Post 16 and was interviewed by Kirk and Conley, and Kirk signed her on as a confidential informant.[5] Conley reviewed the information that Knight had given before and her story had not changed. Knight was requested to contact Plaintiff and arrange a meeting. A meeting was set for April 8, 2010. When Plaintiff asked what the meeting was in reference to, Knight advised Plaintiff she wanted to try and assist law enforcement by making buys.

At the meeting on April 8, 2010, they discussed her son's case and the large amount of time he was facing. The possibility of Knight working for law enforcement

---

[4] Plaintiff has provided evidence of prior incidents/interactions that would support a notion that Matt and Stephanie Conley disliked him. These incidents include: having them reprimanded by a judge for a scheme to conduct nonconsensual/warrantless searches of residences and questioning/challenging Conley on numerous occasions in court.

       However, the Court notes that, as Defendants have consistently pointed out, the conversations between Conley and Plaintiff after the arrest do not indicate any personal animosity. On the contrary, they indicate a professional and friendly relationship.

[5] Plaintiff alleges that Conley, Shoultz, and Kirk were deliberately indifferent to KSP General Orders/mandates concerning confidential informants.

to make buys in order to help her son came up toward the end of a long conversation.

The audio transcript[6] of the first meeting on April 8, 2010, states in relevant part:

> Knight: Well, that's why I called you, because I wanted a trial.
>
> Womack: What's that – what's that old dude got now?
>
> Knight: They're – they're the same thing as the – what's the – Oxycontin? They're not the same thing, but they're oxycodone – codone, and he's got 11. He said he'll take $50 for them.
>
> Womack: Fifty dollars and you – all right. I'll tell you what. I'll go talk to the sheriff's department tomorrow. Tell him – tell him, I guess, to hold them and we'll see what we can do.
>
> Knight: Yeah. I hope he holds them, because he's only got those left.
>
> Womack: Okay. Tell him just – when you leave here, call him. I'll call you first thing in the morning, and I'll try to go talk to him now.
>
> Knight: Okay. If you could talk to him now and he says yes, then I can do it now. It's up to you.
>
> Womack: I'll – it's 4:30. How come one was selling – just curious, I mean, wasn't the last one $20 a pill and –
>
> Knight: Yeah, but these are different. They're – he said they're white and they're just oxycodone – they're oxy – they're they're oxydone. He said they're sorta the same thing but they're not quite as strong, but they're – you know, they're – that's all he's got right now.
>
> Womack: Is he gonna get those other – those – what were the others? Oxycontin?
>
> Knight: Yeah. Toward the end of the month.
>
> Womack: All right. I'll – I'll try to go over there now –
>
> Knight: Okay.

---

[6] The Court notes that Plaintiff takes "great issue" with Defendants' citations to audio recordings between Plaintiff and Defendant Knight because the transcripts are not official documents of record. (Docket No. 98, Page 1.) The Court has reviewed the audio and video and finds that, at least as to the cited portion, the transcripts appear accurate.

Womack: -- and see what I can do.  And I'll call you or something.  Okay?

Knight:  Okay.  I'll just go home and –

Womack:  just tell him – tell him to hold them.

Knight:  Okay.  All right.

Womack:  Good.  I'll know something in the morning.  Okay?

(Docket No. 89-6.)

Shortly after leaving his office, Plaintiff called Knight on her cell phone and requested she come back to his office.[7]  (Docket No. 87-6, Page 13.)  Conley called Crafton and again confirmed Plaintiff had not contacted the Sheriff's Department.  Knight returned to Plaintiff's office and Plaintiff gave her $50, the exact amount they had previously mentioned the drugs would cost.  The following conversation takes place at this time:[8]

Womack:  Here you go. (Defendants allege at this time Womack points to cash located on his desk.  The video is not conclusive one way or another.)
Knight: Okay.
Womack:  Um, they were actually more interested in the others that you got last time, so you may want to . . .
Knight:  Okay.
Womack:  I don't know if he'll have them before trial, but you may want to ask.
Knight:  (Unintelligible . . .)
Womack:  Now listen (unintelligible), I'll come back down here later if you want to just throw them in an envelope or something and throw them through the mail box door or whatever, the little mail slot by the door.
Knight: Uh-huh.
Womack:  I'll come get them.

<hr>

[7] This incident occurs at 2:47 of the third video recording in the folder labeled "Money Delivery."
[8] The Court notes that the audio recording's quality made it difficult at times to decipher what exactly the parties were saying.  The Court has noted any instances where the lack of quality made it impossible to determine what the parties were saying with the "unintelligible" references.

(Third Video File, Money Pick Up Folder.) A portion of Plaintiff's deposition concerning this conversation where the transfer of the $50 takes place is relevant:

Q: When she call – when you called her and she came back, you agree you gave her $50 after you withdraw it; right.

A: Yes.

Q: And there's – there's that portion of events that appears to have been recorded. I've heard of some of that. Have you had a chance to listen to that?

A: Not recently, no. I mean, I heard it at the trial.

Q: If we need to refresh we can, but just to the best of your recollection, and, again I'm not – anytime you want to listen to any of this, I'm not trying to misquote anything on there –

A: That's fine.

Q: -- we can listen to it. I'm just trying to – you know, we've got all that stuff here if you want to hear it and so if you – you know, if we – if it's something that we really need to – a bone of contention – we'll play it but otherwise I'm just trying to see what you remember.

A: Fair enough.

Q: One, your recollection, and, two, you know, if that's what you remember being heard at trial. Two different things. One, I mean, because, you know, from your – what you remember happening and what you, you know, perceived happening and what – what's on the tapes. Do you agree with me there's nothing on the tape when she comes back in that indicates you're giving her monies for personal use? That you said, "Here Connie, here's $50 to go do whatever you want with it. Get gas. Get groceries. Just trying to help you out. I know you're in a bind." Anything of that nature?

A: You're – I think you're correct. I don't think there's anything like that on that particular tape.

Q: Is there any discussion on that tape about that you would think that might lead – regardless of what Connie may have been thinking, knowing that – you know, she's working for the police at that point – but between you – and not knowing that at that time, and you talking to her that would have led someone to believe that she had approval to go ahead and make a buy?

A: I can't speak for Connie. Obviously Connie had a different motive than what I perceived Connie's motive for asking me for money was. Her motive was at the behest of the Kentucky State Police to frame me. My perception of it was, "Here we go, same conversation all over again, here's 50 bucks. Go do what you want. Maybe I won't have to see you again."

Q: Do you know –

A: She called me 18 times to try and delivers these drugs on the night of the 8th. I didn't return her call because I'm not interested in drugs or her drugs, so when I wasn't interested they just sent her into my office and had her dump them on my desk when I wasn't looking.

Q: I understand. But from your recollection of the tapes did you make any statements that would have indicated that you had spoken to somebody at the sheriff's department or somewhere else that they okayed –

A: No. I don't recall. I'm not suggesting it's not on the tape, Mr. Wright. I don't recall specifically, no.
    I think – I do think if you're referring to the – I think I did say something, "I'll call them." I think I was talking or – "I'll call the sheriff," or something and see what, you know – I think that was that statement may have been made.
                    * * *
Q: -- that's why they're the – we've got them here if we need to listen to them [the tapes], but is there – did you make some statement to her about putting something in an envelope and leaving it in the mail slot when she returned to your office –

A: Yes.

Q: -- when you gave her $50?

A: Yes, I did.

Q: And what were you talking about?

A: Well, again, I was – if you recall when it's made, I'm basically kind of escorting her out of the door, okay, and I – my recollection was I thought she said something and I don't know if it's on the tape or not, "Well, I'll bring them back to you."

"No. It's okay. Put them in an envelope and throw them through the door; okay?" And that was it.

Q: And I understand, you're telling me your mindset at the time because –

A: Right.

Q: -- you're trying to get this lady off your back but I'm just saying –

A: Right.

Q: -- when you look at it from an outsider listening to the tapes, could you, regardless you don't know what she's thinking, you didn't know she was working for the police, but when you just hear that, if you just take it at face value, jus that alone it suggests that if she bought –

A: Well –

Q: -- something to put through the mail slot, doesn't it? I mean, if I'm just sitting here listening to it –

A: If you just listen to that one tape or if you just read one chapter of a book, perhaps so, but my mindset was not that. It wasn't – the jury just saw that one episode and they didn't believe it. I mean, that's all I can speak to.

Q: I understand.

A: Obviously I don't know –

Q: I understand.

A: -- what Connie Knight – obviously I don't know that Connie Knight has a motive to do all of these things. I just know that basically I'm escorting her out of the door. "I'll bring them back to you."

"No.  That's all right.  Throw them through the door."

I didn't think I'd ever see her again.  She called me 18 times that night.  I didn't answer one of her phone calls.  I didn't agree to go meet her anywhere.  I didn't want any drugs from Connie Knight.

(Docket No. 87-3, Page 153-58.)[9]  Plaintiff concedes there was no suggestion on the audiotape that he gave her this money for personal use, such as gas, or groceries.  Subsequently, Matt Conley supplied drugs to Knight and began an undercover drug investigation.

Knight attempted to contact Plaintiff approximately eighteen (18) occasions on the night of April 8, 2010.[10]  It appears that at some point Knight was able to get in touch with Plaintiff by phone.  The following phone conversation took place:

> Womack: Hello.  This is Dax Womack.
> Knight:  Hi Dax, This is Connie.  Listen.  The guy just got home.
> Womack: Uh-huh.
> Knight:  So, I'm – I'm going to get them and – I'll bring them – I'll bring them by there.
> Womack:  Okay.
> Knight:  Okay.
> Womack:  Thank you.  Bye.

(Docket No. 89-9.)  A second phone call occurred on April 9th:

> Womack:  Hello.
> Knight:  Hey.  Hello?
> Womack:  Yeah.
> Knight:  This is Connie.
> Womack:  Yeah.  Hey, Connie.
> Knight:  Listen.  Hey, I got those, umm, umm, others for you and I have 10 more of the others that you like.  You know what I'm saying?

---

[9] Knight subsequently testified at a later proceeding that she had supplied drugs to Plaintiff before and testified that Plaintiff had previously given her money for drugs.  (Docket No. 89, Page 7.)
[10] Connie Knight does not dispute this point in her motion for summary judgment.

Womack:  Do what?  Excuse me?

Knight:  The other – the other ones that we get.  Oxycontin.  I've got 10 more of those, too, if you need them.

**Womack:    Well, -- oh, oh – well, let me go talk with him.  I mean, I don't – I don't know.**

Knight:  Okay.

Womack:  Okay?

Knight:  All right.  And I'll just, what, come on up there with the other and bring them to you?

Womack:  Uh, yeah.

Knight:  Okay.

Womack:  I guess.  I mean, yeah.

Knight:  All right.

Womack:  Okay.

Knight:  All right.  Bye.

Womack:  All right.  Bye. (emphasis added.)

(Docket No. 89-9.)

Plaintiff states all of these conversations concerning the purchasing of drugs took place only in the context of Knight possibly working as an informant for law enforcement in order to get her son a reduced sentenced.  Plaintiff paints a picture that Connie Knight continually bothered him and he would say anything to "get her out of his hair."   He vehemently denies it was ever his intention to use Knight to purchase drugs.  Furthermore, he claims Knight has never purchased drugs for him, as she claims. He states she previously brought drugs to him, which he did not encourage or invite, and he promptly threw them in the trash and instructed her to never do that again.[11]   As a result, she continually mentioned how much the drugs he threw away were worth and her bad situation financially.  Because of this, Plaintiff felt sorry for Knight which was

---

[11] Knight concedes that Plaintiff did throw the drugs in the trash, but appears to claim it was because she did not bring the type of drugs he wanted (rather than out of displeasure with her choice to bring drugs in his office as a general matter).

part of the reason he gave her $50 in the first place--the other reason being that he wanted her to stop bothering him.

On April 9, 2010, Knight returned to Plaintiff's law office while in possession of drugs that were provided by Matt Conley, which Plaintiff alleges was a direct violation of KSP General Order OM-C-6.[12] Knight drove to Plaintiff's office on her own, but was followed by Conley and Scott Ingram. (Docket No. 87, Page 6.) At the time Knight entered Plaintiff's office, she was wired with audio and video recording capabilities. The following dialogue took place when Knight entered Womack's office and sat down:[13]

> Womack: I need to give you a heads up, when I talked to you yesterday, Markwell was gone, and is not in his office yet. So we have nothing firm. Okay?
>
> Knight: Okay, I know you're trying, that's all I ask.
>
> Womack: I mean, yeah, I'm trying. I'm getting very worried about this case. I've been trying to visualize how its going to play out to a jury, and the only…you know if the judge would, if I had some assurance that the judge would limit what they could talk about as far as, if they could just limit it to that day.

(Docket No. 87-6, Page 16-17.) At this point in the video, the parties' stories significantly diverge.

Defendants state Conley calls Knight to see if the transaction had occurred, and Knight advises that it had. Subsequently, at some point, Knight states Plaintiff takes the

---

[12] The Court notes there is a genuine dispute as to: (1) whether OM-C-6 even applied to this situation; and (2) if it did, whether or not it was actually violated. For purposes of these summary judgment motions, the Court will assume OM-C-6 was violated.

[13] It should be noted that the Defendants admit that as soon as Ms. Knight entered the building the audio/listening device began malfunctioning. (Docket No. 87-6, Page 16.) This malfunctioning is what they allege required Matt Conley to subsequently call Knight on her cell phone.

drugs and puts them in his middle desk drawer. On the other hand, Plaintiff alleges that Knight lay/threw the drugs on Plaintiff's desk while Plaintiff had his back turned.[14] Furthermore, Plaintiff states this was at the instruction of the KSP, presumably through the phone call by Conley.[15] The Court has viewed the video and notes it is not conclusive one way or another.

Subsequently, Scott Ingram and Matt Conley, without a search warrant, entered Plaintiff's office without knocking or announcing. The individual door to his office was shut, but unlocked. The arresting officers—Conley and Ingram—state they witnessed Conley produce drugs from inside his middle desk drawer upon inquiry as to the location of the pills. Knight also testified Plaintiff put them in his desk drawer. (Docket No. 89, Page 10.) Plaintiff vehemently denies this and states the drugs were sitting on his desk and he had no knowledge of them until Conley and Ingram inquired about them. In any event, Plaintiff was peacefully arrested for first degree possession of a controlled substance and prescription drugs not in proper container. Plaintiff was not handcuffed and was permitted to speak with his father, Zack Womack, before leaving the premises.

---

[14] It should be noted that at the Grand Jury Proceeding it appears Zack Womack, who was permitted to testify on behalf on Plaintiff by the grand jury, appears to have alleged the drugs were planted in an open desk drawer rather than thrown on a desk. (Docket No. 98-4, Page 30.) In any event, Conley alleges that Plaintiff opened a desk drawer to retrieve the drugs. (Docket No. 98-4, Page 32-33.)

[15] Connie Knight does not comment on this allegation in her motion for summary judgment. However, other Defendants allege that the phone call Knight received was from Matt Conley and was an inquiry as to whether she had delivered the pills, which she responded in the affirmative. (Docket No. 86, Page 4.) Defendant Matt Conley states the audio equipment had failed, which is why the phone call was even made in the first place.

III.    <u>Post-Arrest Events</u>

Initially the criminal case was filed in Henderson District Court.   Hopkins County Attorney Todd P'Pool was appointed special prosecutor for the proceeding. P'Pool screened the case, examined the facts, and reviewed the videotape evidence.[16] He formed the opinion that probable cause existed for the arrest of Plaintiff.  (Docket No. 89-11, P'Pool Affidavit.)  Plaintiff alleges Matt Conley was somehow responsible for having six (6) additional charges added, but P'Pool's affidavit unequivocally states that he made the decision to bring additional charges.[17]  *Id.*  Defendant also alleges that Conley was somehow responsible for editing the videotape shown at the preliminary hearing, but P'Pool's Second Affidavit makes it clear that was P'Pool's decision. (Docket No. 112-2.)[18]

At the preliminary hearing on May 18, 2010, the additional charges were dismissed by the court after the judge found no probable cause existed to those charges. However, the district court did find probable cause to believe Plaintiff had committed the offenses of Possession of a Controlled Substance in the First Degree and Possession of a Prescription Drug not in a proper container.   Plaintiff states Conley, Knight, and Ingram testified falsely at these and later proceedings, which indirectly resulted in the findings of probable cause.   Furthermore, Plaintiff believes that due to Defendants

---

[16] The prosecution would have had the benefit of Conley's "oral communications" and "case report," which would have reaffirmed his story as detailed above.  (Docket No. 172 Matt Conley Deposition I, Page 80.)
[17] Plaintiff's defense attorney has signed an affidavit stating that P'Poole previously told him it was Conley that requested the additional charges be brought against Plaintiff.  (Docket No. 98-1.)
[18] As to any alleged withholding of the full videotape or the confidential informant file, there does not appear to be a genuine dispute that the KSP gave it to the prosecution.

continued false statements, fabrication of evidence, and withholding of exculpatory evidence,[19] the prosecutors formed the opinion that probable cause existed.[20]

The case was then transferred to the Henderson County Grand Jury for consideration. Chris Cohron, the Commonwealth Attorney from Bowling Green, was appointed special prosecutor to handle the circuit court felony trial. Like P'Pool, Cohron screened the case and decided to continue to prosecute Plaintiff. On September 22, 2012, the Henderson County Grand Jury was impaneled and indicted Plaintiff.[21]

Prior to the trial of the criminal action, Plaintiff filed a motion to suppress evidence seized from him at the time of the arrest and certain statements made immediately following his arrest. On December 17, 2010, the trial court overruled this motion to suppress, finding the facts of the case support a finding of probable cause to believe Plaintiff had, or was in the process of, committing a felony at the time of the arrest. Ultimately, in the criminal case in Henderson Circuit Court, the jury returned a verdict of not guilty as to the offense of Possession of a Controlled Substance in the First Degree.[22]

Plaintiff filed suit in this Court on April 1, 2011. (Docket No. 1, Page 11-14.) The Court previously dismissed all claims against Defendants in their official

---

[19] Specifically, Plaintiff states they withheld from the prosecutors the fact that Connie Knight was paid $300.00 to take drugs in Plaintiff's law office and the "delivery method" she was instructed to use with respect to the pills. (*See* Docket No. 98-1, Number 8.)

[20] The alleged false statements primarily surround prior drug transactions (which presumably only Knight would have knowledge of), the method of delivery of the pills, and payment Knight received for assisting law enforcement.

[21] Matt Conley testified at the preliminary hearing, the grand jury, the suppression hearing, and the trial. (Docket No. 172, Matt Conley Deposition.)

[22] The other charge had been voluntarily dismissed by the Commonwealth prior to the start of Defendant's jury trial.

capacities, the § 1983 conspiracy claim against Stephanie Conley in her individual capacity, and all defamation claims against Defendants in their individual capacities, except Stephanie Conley. (Docket No. 29.) Plaintiff has conceded that some of the claims which remained after the motion to dismiss should be dismissed. (Docket No. 181; 168.) Defendants now move for summary judgment as to all claims remaining against them. (Docket No. 83; 86; 87; 89; 90.)

## <u>STANDARD</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a

genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

The Court will evaluate Defendants' Motions for Summary Judgment by looking at their arguments with respect to each individual claim made by Plaintiff. For purposes of a summary judgment motion, the Court must view facts in the light most favorable to the Plaintiff, the nonmoving party. *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).

## Federal Law § 1983 Claims

For the federal law 42 U.S.C. § 1983 claims, the Court must determine whether a constitutional right has been violated. "To state a valid § 1983 claim, Plaintiff must establish that: (1) he was deprived of a right secured by the Constitution or the laws of the United States, and (2) the deprivation was caused by a person acting under the color of state law." *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir. 2001) (quoting *West v. Atkins,* 487 U.S. 42, 48 (1988)). "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail." *Id.* As for the second requirement, except for

Connie Knight,[23] there is no dispute that Defendants were acting under color of state law. Therefore, the only remaining question is whether Plaintiff was "deprived of a right secured by the Constitution or the laws of the United States." *Id.* The Court will address each of Plaintiff's constitutional claims in turn, viewing the facts in the light most favorable to the nonmoving party, which in this case is Plaintiff. *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). However, before addressing each of Plaintiff's constitutional claims, the Court will first resolve whether or not Connie Knight was "acting under the color of state law." *Redding*, 241 F.3d at 532.

I.    <u>Connie Knight was Acting under the Color of State Law for Purposes of the Federal Law § 1983 Claims</u>

To state a valid § 1983 claim, a Plaintiff must establish that a deprivation of a Constitutional right was caused by a person acting under the color of state law. *Id.* Accordingly, if Defendant Knight was not acting under the color of state law, the § 1983 claims against her are not cognizable.[24]

The Supreme Court has been receptive to giving private individuals qualified immunity, implicitly treating them as state actors, although one could arguably distinguish the facts of *Filarsky* from the present case:

> Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal

---

[23] As discussed below, the Court will determine that Connie Knight was acting under the color of state law for purposes of the §1983 claims.

[24] "The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985." *Moldowan v. City of* Warren, 578 F.3d 351, 399 (6th Cir. 2009). However, Plaintiff's claims against Knight are not based on the mere furnishing of information to state officials.

action for the same conduct. Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

The public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties. Not only will such individuals' performance of any ongoing government responsibilities suffer from the distraction of lawsuits, but such distractions will also often affect any public employees with whom they work by embroiling those employees in litigation. This case is again a good example: If the suit against Filarsky moves forward, it is highly likely that Chief Wells, Bekker, and Peel will all be required to testify, given their roles in the dispute. Allowing suit under § 1983 against private individuals assisting the government will substantially undermine an important reason immunity is accorded public employees in the first place.

Distinguishing among those who carry out the public's business based on the nature of their particular relationship with the government also creates significant line-drawing problems. It is unclear, for example, how Filarsky would be categorized if he regularly spent half his time working for the City, or worked exclusively on one City project for an entire year. Such questions deprive state actors of the ability to "reasonably anticipate when their conduct may give rise to liability for damages," frustrating the purposes immunity is meant to serve. An uncertain immunity is little better than no immunity at all. (citations omitted.)

*Filarsky v. Delia*, 132 S. Ct. 1657, 1666 (2012) (finding private attorney hired by city to do investigation was entitled to qualified immunity). Although not binding, a district court case from the Eastern District of New York with facts similar to this case, which both sides cited, carefully examined this issue and is instructive:

Although it is presumably common place for private citizens to assist law enforcement in making arrests, the question of whether

qualified immunity is available to such persons turns out to be surprisingly novel. No court in this circuit has addressed the issue, and the few decisions from courts in other circuits that have addressed similar questions, were decided before *Richardson* or else do not conduct the historical inquiry required by *Richardson*. It is, therefore, necessary to start from scratch on this issue and turn to the two inquiries mandated by *Richardson*.

\* \* \*

This case presents exactly such a scenario, and the above discussion of the relevant policy considerations leads to the conclusion that qualified immunity is available to private actors who are enlisted by law enforcement officials to assist in making an arrest.

*Mejia v. City of New York*, 119 F. Supp. 2d 232, 268 (E.D.N.Y. 2000).

Additionally, the Sixth Circuit recognizes three tests for determining whether private conduct is fairly attributable to the state:

This circuit recognizes three tests for determining whether private conduct is fairly attributable to the state: the public function test, the state compulsion test, and the nexus test.

The public function test 'requires that the private entity exercise powers which are traditionally exclusively reserved to the state....' The typical examples are running elections or eminent domain.

The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state.

Finally, the nexus test requires a sufficiently close relationship (*i.e.* through state regulation or contract) between the state and the private actor so that the action may be attributed to the state.

*Ellison v. Garbarino,* 48 F.3d 192, 195 (6th Cir. 1995) (citations omitted); *see also*

*Tahfs v. Proctor*, 316 F.3d 584, 590-91 (6th Cir. 2003). Under these tests, Knight's

conduct would be attributable to the state. Knight was engaged in investigation and

undercover operations which is behavior traditionally exclusively reserved to the state,

the state encouraged her to take this particular action, and there was a sufficiently close relationship between the state and Knight so that the action may be attributed to the state.

Furthermore, the Sixth Circuit has made it clear that in certain circumstances private persons may become "state actors" for §1983 purposes:

> Nevertheless, there are circumstances under which private persons may, by their actions, become "state actors" for § 1983 purposes. "Private persons, jointly engaged with state officials in [a] prohibited action, are acting under color of law for purposes of the statute. To act under color of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." Therefore, a private party can fairly be said to be a state actor if (1) the deprivation complained of was "caused by the exercise of some right or privilege created by the State" and (2) the offending party "acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." (citations omitted.)

*Tahfs v. Proctor*, 316 F.3d 584, 590-91 (6th Cir. 2003). In this case, (1) the alleged deprivation was caused by the exercise by of a right or privilege—performing an undercover operation--created by the State; and (2) Knight acted together with State officials. *Id.* Accordingly, the Court will **DENY** Knight's motion for summary judgment on the §1983 claims on the basis that Knight is not a state actor. The Court holds that for the purposes of the § 1983 claims Defendant Knight is a state actor.

II.   <u>§ 1983 Conspiracy to Violate Civil Rights[25]</u>

After the motion to dismiss, the § 1983 conspiracy claim remains against all Defendants in their individual capacities, except Stephanie Conley.[26]   (Docket No. 29.) A civil conspiracy under § 1983 is:

> [A]n agreement between two or more persons to injure another by unlawful action. *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007).   To successfully plead a civil conspiracy, Plaintiffs must allege that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the Plaintiffs of their constitutional rights, and (3) an overt act was committed." *Id.* (citation omitted).   Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved. *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). "If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983. *Cooper v. Parrish*, 203 F.3d 937, 953 n. 2 (6th Cir. 2000) (citing *Wyatt v. Cole*, 504 U.S. 158, 168–69 (1992)).

*Pritchard v. Hamilton Twp. Bd. of Trustees*, No. 09-4594, 2011 WL 2039066, at *13 (6th Cir. May 25, 2011).   "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983."   *Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009) (granting summary judgment to defendants on conspiracy claims).   Furthermore, the Sixth Circuit has acknowledged that because rarely in a conspiracy case will there be direct evidence of an express

---

[25] To the extent Plaintiff was claiming a conspiracy under 42 U.S.C. 1985, that provision provides no basis for relief.   That provision applies only when discrimination was based on race or membership in another class comprising discrete and insular minorities that receive special protection under the Equal Protection Clause because of inherent personal characteristics.   *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 314 (6th Cir. 2005).

[26] Plaintiff claims there was a conspiracy to violate his constitutional rights among Defendants, which the Court presumes is a claim under § 1983.

agreement among all the conspirators to conspire, circumstantial evidence may provide adequate proof of conspiracy. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Nevertheless, there still must be some "evidence from which to infer that the defendants acted in concert" in their unlawful acts. *Gardner*, 330 F.3d at 854.

    a.  Defendants Matt Conley and Connie Knight

As to Defendants Connie Knight and Matt Conley, the Court finds Plaintiff has only made a conclusory allegation of a conspiracy unsupported by evidence. Therefore, a reasonable jury could not find they conspired "to set the Plaintiff up to be charged criminally." Plaintiff has shown a history between Plaintiff and Conley from which a reasonable jury could conclude there was some animosity between the parties, but that alone won't support a conspiracy between Conley and Knight. Plaintiff and Defendants do not appear to dispute all events, including the recorded conversations, prior to the actual "drug transaction." These events are consistent with a legitimate police investigation and do not support an allegation of a conspiracy.[27] Plaintiff has established the parties' disagree on what actually transpired during the drug transaction and where the drugs were subsequently found, but there is no evidence, circumstantial

---

[27] Admittedly, Plaintiff has alleged the investigation was in violation of a KSP General Order, which Defendants dispute. However, a violation of a General Order alone does not amount to a Constitutional violation. Furthermore, the Court does not believe an alleged violation of a General Order is more than a "scintilla" of evidence of a conspiracy to violate Plaintiff's civil rights. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

or direct, that Knight and Conley actually *conspired* to "throw the drugs on Plaintiff's desk while his back was turned," other than the conclusory allegation by Plaintiff who has no actual direct knowledge of such a conspiracy.[28] *See, e.g., Jackim v. Sam's E., Inc.*, 378 F. App'x 556, 564 (6th Cir. 2010) (finding conclusory allegation that Sam's Club conspired with other Defendants were insufficient to withstand a motion for summary judgment because they lacked the requisite material facts and specificity). While Plaintiff has established there was a withholding of at least some evidence from him, including a $300 payment to Knight, this does not support a conspiracy between Conley and Knight to violate Plaintiff's constitutional rights because, as will be discussed below, these actions would not amount to a constitutional violation.

Plaintiff has only made conclusory allegations unsupported by evidence of a conspiracy to violate his constitutional rights against Knight and Conley. Accordingly, the Court will **GRANT** Knight and Conley summary judgment on this claim.

### b. Defendant David Crafton

As to Defendant Crafton, the Court finds that a reasonable jury could not conclude he conspired with other Defendants "to set the Plaintiff up to be charged criminally." Other than a conclusory allegation that Crafton "agreed to play a role" in a conspiracy, Plaintiff has offered no evidence that supports such a conclusion. Plaintiff generally alleges:

---

[28] Notably, Plaintiff's conspiracy claim is very general as it is only framed as a "conspiracy to violate his civil rights." (*See* Docket No. 168.) To the extent Plaintiff was alleging a conspiracy by Defendants to later falsely testify as to what transpired at the drug transaction, absolute immunity for such testimony would block such a claim. *See Rehberg v. Paulk*, 132 S.Ct. 1497, 1507-08 (2012).

Knight, Conley, and Kirk initially developed the plan to send Knight into Womack's private law office with drugs and to toss them on his desk when he wasn't looking. Shoultz, Crafton, and Ingram each agreed to play a role, and in fact did. Thereafter, Knight committed the overt act by planting the drugs on Womack's desk.

(Docket No. 98, Page 33.)

While Plaintiff alleges Crafton was somehow intimately involved in the investigation, the evidence and facts support the opposite conclusion. Plaintiff has produced no evidence in support of an alleged meeting in the early stages of the investigation where allegedly certain decisions were made about how the case would proceed. (Docket No. 86, Page 16-17, 28.) Crafton states his sole involvement in the case related only to receiving phone calls from Conley about whether or not Plaintiff had contacted the Henderson County Sheriff's Department. (Docket No. 86, Page 28.) Crafton checked with officers of the department and responded that there was no such cooperation taking place. *Id.* Significantly, Plaintiff has not asserted nor offered proof that Crafton lied or misled Conley about whether he was in contact with the Sheriff's Department.

Conley agrees the only limited contact he had with Crafton concerning the investigation was to confirm Plaintiff had not reached out to the Sheriff's Department. The only statement it appears Crafton ever made beyond confirming Plaintiff was not in contact with his office was a brief remark that Conley had a duty to investigate a complaint. (Docket No. 114-3 Transcript of Preliminary Hearing, Page 16-17, 21.) The Court notes that Crafton was not part of the KSP, so it is logical that he would have not been intimately involved in the investigation. It does not appear Crafton even met or

spoke with Knight.  There is not any circumstantial evidence that would even remotely implicate Crafton in any conspiracy.  Accordingly, the Court will **GRANT** Defendant David Crafton summary judgment on the § 1983 conspiracy claim.

   c. Defendant Scott Ingram

   Defendant Scott Ingram is very similar to David Crafton in that he did not work for the KSP and does not appear to have been intimately involved with the investigation in any respect.  There is no indication he ever met with Conley or Knight or had any control over the investigation whatsoever, prior to the day of the drug bust.[29]  Again Plaintiff makes the conclusory allegation that Ingram "agreed to play a role" in the conspiracy, without expanding on what exactly transpired.  However, in at least one significant respect Scott Ingram is distinct from David Crafton--he was present on the day of the "drug bust" and actually entered Plaintiff's office with Conley to make the arrest.

   It is unclear from the record to what extent, if at all, Ingram and Conley conversed concerning the investigation on the day of the "drug bust."  The only confirmed fact appears to be that Conley and Ingram entered the office together and both allege that Plaintiff removed the drugs from out of his desk drawer when questioned about where they were.  Plaintiff claims this is false and that the drugs were on his desk, not in a drawer, which he did not realize until they entered his office.  However, as to the conspiracy claim, Plaintiff only makes a conclusory allegation that Ingram "agreed to play a role."

---

[29] The Court notes that neither party deposed Ingram or Crafton.  Therefore, the Court's conclusions are based entirely on the briefs and transcripts from prior proceedings (including the trial).

The Court is unable to determine how exactly Plaintiff believes Ingram "agreed to play a role" in a conspiracy against him. Presumably, it would involve some notion that not only did Ingram lie about where the drugs were located, but he agreed with other Defendants to do so. However, even if that is Plaintiff's theory, that theory is unsupported by any evidence and is based solely on conclusory allegations.[30] Plaintiff has not produced any evidence that Ingram ever spoke with Knight. There is not any circumstantial evidence that would even remotely implicate Ingram in any conspiracy. Accordingly, the Court will **GRANT** Defendant Scott Ingram summary judgment on the § 1983 conspiracy claim.

### d. Defendants Robert Shoultz and Jason Kirk

Much like David Crafton, Plaintiff asserts merely a conclusory allegation that Shoultz and Kirk "initially developed a plan to send Knight into Womack's private law office with drugs and to toss them on his desk when he wasn't looking":

> Knight, Conley, and Kirk initially developed the plan to send Knight into Womack's private law office with drugs and to toss them on his desk when he wasn't looking. Shoultz, Crafton, and Ingram each agreed to play a role, and in fact did. Thereafter, Knight committed the overt act by planting the drugs on Womack's desk.

(Docket No. 98, Page 33.) Plaintiff has provided very little evidence that supports such a conclusion. Notably, merely agreeing to a plan to send Knight into the office would not be improper and assuredly not rise to the level of a constitutional violation. On the contrary, this would be a proper investigative technique. Furthermore, the Court notes

---

[30] The Court reiterates that to the extent Plaintiff was alleging a conspiracy by Defendants to later falsely testify as to what transpired at the drug transaction, absolute immunity would block such a claim. *Rehberg v. Paulk*, 132 S.Ct. 1497, 1507-08 (2012).

Plaintiff's allegation of Shoultz and Kirk being involved in a conspiracy is to some degree inconsistent with the allegation that Conley called Knight while she was in the office. If there was truly a "plan" among these Defendants to send Knight into Plaintiff's office to toss drugs on his desk while he wasn't looking presumably this course of action would have been established well before Knight actually entered the office.

Admittedly, Plaintiff established Shoultz and Kirk met to discuss the ongoing investigation, met with Connie Knight, supervised Conley during the investigation, and authorized an alleged departure from a General Order. Nonetheless, these facts do not support a conspiracy to violate Plaintiff's constitutional rights.[31] On the contrary, these actions are what competent supervisors would be expected to do on a daily basis, aside from the alleged departure from a General Order which is not constitutionally significant. It is the notion that there was a conspiracy to throw drugs onto Plaintiff's desk while he wasn't looking and subsequently lie about it by stating Plaintiff produced the drugs from his desk drawer that is constitutionally concerning. And it is these allegations that Plaintiff has not supported with anything other than conclusory allegations as to Shoultz and Kirk.

There is no indication Shoultz and/or Kirk would have authorized, nor that they did authorize, Knight to throw drugs onto Plaintiff's desk while he wasn't looking. Furthermore, Shoultz and Kirk would not have been privy to whether or not the drugs were actually in Plaintiff's drawer or on his desk. Therefore, Shoultz and Kirk have

---

[31] Departures from General Orders, standing alone, would not be a Constitutional violation.

never had an opportunity to lie or fabricate evidence about what transpired that day because they were not there. Finally, while the video is not conclusive as to what actually occurred, it in no way implicates Jason Kirk or Robert Shoultz. Likewise there is no evidence that Shoultz and/or Kirk knew or condoned a scheme to lie and plant drugs on Plaintiff in order to prosecute him.

A reasonable jury could not conclude that Robert Shoultz and Jason Kirk conspired with Defendants to violate Plaintiff's constitutional rights. There is no evidence to support these claims against Shoultz and Kirk, only unsupported accusations and speculation. Accordingly, the Court will **GRANT** Defendants Shoultz and Kirk summary judgment on the § 1983 conspiracy claim.

III. Fourth Amendment §1983 Claims for Unreasonable Entry/Search and Seizure/Arrest

Plaintiff asserts three separate Fourth Amendment claims under 42 U.S.C. § 1983. The first claim is the conduct of Defendants Connie Knight, Matt Conley, and Scott Ingram constitutes an unreasonable entry/search within the meaning of the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.[32] (Docket No. 1, Page 11.) The second claim is the conduct of Defendants Connie Knight, Matt Conley, and Scott Ingram constitutes an unreasonable seizure/arrest within the meaning of the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The third claim is that Defendants Robert Shoultz, Jason Kirk, and Matt Conley deliberately concealed exculpatory evidence, continuing

---

[32] The Court previously dismissed Plaintiff's claims against all Defendants in their official capacities. (Docket No. 29.) The Plaintiff has stated the first two Fourth Amendment claims are only being pursued against Connie Knight, Matt Conley, and Scott Ingram. (Docket No. 181.)

the pre-trial deprivation of liberty by loss of freedom of actions due to pending criminal charges.[33]  (Docket No. 179; 181.)  The third claim will be addressed in Section IV below.

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The amendment protects citizens from warrantless intrusions into the home subject to a narrow group of exceptions, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), and mandates that all arrests be supported by probable cause.  *Radavansky v. City of Olmstead Falls,* 4496 F.3d 609, 614 (6th Cir. 2007).  The Supreme Court has defined "probable cause" as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979).  As to the first two claims, their resolution will rest upon whether or not Defendants had probable cause to enter/search and seize/arrest.[34]

---

[33] As will be discussed below, the withholding of exculpatory evidence also is the basis for Plaintiff's Fifth Amendment claims.  However, it is clear this can also form the basis for a Fourth Amendment claim. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006) ("Rather, we characterize the cause of action simply as the right under the Fourth Amendment to be free from continued detention without probable cause."); *Jackson v. Cnty. of Washtenaw*, 310 F. App'x 6, 7 (6th Cir. 2009).

[34] The Court notes the inquiry focuses on the information/evidence available to Defendants at the time of search/arrest, not any subsequent information that was uncovered.  *See, e.g., Mejia v. City of New York*, 119 F. Supp. 2d 232, 257 (E.D.N.Y. 2000).

a. Probable Cause and Prior Proceedings/Findings – Claims One and Two

    i. <u>Precedent Permits Review of Probable Cause Determination by Defendants Despite Findings at Prior Proceedings</u>

Defendants argue there was probable cause found at a preliminary hearing, grand jury indictment, suppression hearing, and trial. A preliminary hearing finding probable cause has preclusive effect unless there is evidence that the claim is based on a police officer's supplying false information to establish probable cause. *Hinchman v. Moore*, 312 F.3d 198, 202-03 (6th Cir. 2002). However, the false statements or omissions must be material or necessary to the finding of probable cause. *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001). Essentially, if probable cause existed aside from the false statements, Plaintiff's claim will fail. *Id.*

Additionally, the return of an indictment, "fair upon its face," by a grand jury is conclusive as to the existence of probable cause. *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006); *see, e.g., Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002); *Cook v. McPherson*, 273 Fed. App'x. 421 (holding plaintiff's indictment by grand jury was dispositive of his malicious prosecution claim). However, there is precedent permitting Plaintiff "to open up the door" to attack the "presumption" that there was probable cause:

> When a grand jury, upon other testimony, than that of the prosecutor alone, find an indictment to be a true bill, the presumption is prima facie that, as they, on their oaths, have said that the person indicted is guilty, the prosecutor had reasonable grounds for the prosecution.
>
> Nevertheless, the law still presumes that the person indicted, is innocent. But this presumption will not repel the inference, that

there was 'probable cause.' And consequently, the final acquittal of the accused will not, per se prove a want of 'probable cause.

An acquittal opens the question so as to give the party prosecuted an opportunity, in an action for malicious prosecution, to offer evidence to repel the presumption growing out of the action of the grand jury.

*Conder v. Morrison*, 121 S.W.2d 930, 931-32 (1938); *see also Bielefeld v. Haines*, 3:04CV-151-R, 2005 WL 6122527 (W.D. Ky. Apr. 7, 2005) *aff'd*, 192 F. App'x 516 (6th Cir. 2006) ("The grand jury indictment will shield the defendants from liability unless the testimony given to the grand jury was false or the prosecutor knew the action was not warranted by the facts."); *Hinchman,* 312 F.3d 198, 202-03 (6th Cir. 2002) (noting that a grand jury indictment does not foreclose a subsequent civil action for malicious prosecution where there is evidence of false statements or misrepresentations by law enforcement officials during the criminal proceeding).

The Court notes that prior Sixth Circuit precedent permitting an attack on prior findings of probable cause if there are accusations of false statements or omissions necessary to the finding of probable cause for purposes of establishing a § 1983 claim appears to be in conflict with a recent Supreme Court case:

For these reasons, we conclude that grand jury witnesses should enjoy the same immunity as witnesses at trial. This means that a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony. In addition, as the Court of Appeals held, **this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution.** Were it otherwise, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." In the vast majority of cases involving a claim against a grand jury

> witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.[1] (citations omitted.) (emphasis added.)

*Rehberg v. Paulk*, 132 S. Ct. 1497, 1506-07 (2012). The Court also notes footnote one at the end of this block quote:

> Of course, we do not suggest that absolute immunity extends to *all* activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits, see *Kalina v. Fletcher,* 522 U.S. 118, 129–131, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997); *Malley v. Briggs,* 475 U.S. 335, 340–345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), and fabricate evidence concerning an unsolved crime, see *Buckley,* 509 U.S., at 272–276, 113 S.Ct. 2606.

*Rehberg*, 132 S. Ct. at 1508 n. 1. Taking into account footnote one and the arguably restrictive language of "any other § 1983 claim **concerning the initiation or maintenance of a prosecution**," the Court finds this precedent does not preclude an attack of probable cause in this case involving a § 1983 Fourth Amendment claim **based on unreasonable entry/search and arrest/seizure**. In making this finding, the Court notes that the two Fourth Amendment claims are not *based* on Conley, Knight, or Ingram's testimony at any of the prior proceedings, which is shielded by absolute immunity. On the contrary, they are based on whether or not they had probable cause to enter Plaintiff's office (a search) and subsequently seize/arrest him.

In an effort to overcome the presumption of probable cause from prior proceedings, Plaintiff has made an allegation that false testimony/omissions at these prior proceedings were material to a finding of probable cause. As discussed, this is a

permissible way to overcome a presumption of probable cause. Furthermore, these claims are distinct from claims that would be *based* on testimony from these prior proceedings, such as a § 1983 malicious prosecution claim. Therefore, *Rehberg* and its discussion of absolute immunity is not a barrier to Plaintiff attempting to make them.

    ii.   <u>Assessing If Alleged False Statements/Omissions Were Material to Findings of Probable Cause</u>

    1.  <u>Entry/Search Claim</u>

Plaintiff has alleged false testimony that would have been "material" to a finding of probable cause for the entry/search of Plaintiff's office. Specifically, Plaintiff has alleged that the plan was to "set him up" by throwing the drugs on his desk while he was not looking. The failure to disclose such a set up would be an omission material to a finding of probable cause for the entry/search.

    2.  <u>Arrest/Seizure Claim</u>

The Court finds that the purported false statement as to the planned delivery method involving an alleged instruction to throw the drugs while Plaintiff's back was turned would be "material" or "necessary" to a probable cause determination with respect to the arrest/seizure.[35] *See, e.g., Sykes v. Anderson,* 625 F.3d 294, 305 (6th Cir. 2010) (requiring false statements or omission to be material or necessary to finding of probable cause). The Court notes, however, that where the drugs were located, whether on the desk or in his drawer, when Ingram and Conley entered the office would not be material to a probable cause determination. This is because, given all of the prior

---

[35] The Court notes that Plaintiff's apparent position that the drugs were on his desk is somewhat different than what Zack Womack (his father) testified to at the grand jury proceeding when he advised the drugs were in an open drawer.

recorded conversations and Knight's statement that Plaintiff had taken possession of the drugs, Conley/Ingram would have had probable cause to arrest and/or seize Plaintiff regardless of whether they were on the desk or in a drawer.

The Court agrees with Defendants that the $300 payment Conley failed to mention, even when faced with a direct question about what Knight stood to gain from this, would not have been material to a finding of probable cause.[36] This conclusion is merited based on all of the prior recorded conversations independently verifying the vast majority of what Knight testified to, along with Conley and Ingram's testimony. The Court also agrees that any editing of the investigation tapes in these proceedings was not "material" to a finding of probable cause.[37] Furthermore, even assuming there was a misrepresentation by Conley concerning the functionality of the audio/video and transmitting equipment and/or the clarity of such recordings, such misrepresentation would not have been material to a finding of probable cause. Finally, the Court finds that Conley's failure to remember participating in a jury trial with Plaintiff was not material to a finding of probable cause, especially when taking into account that prior to that "omission" he admitted he was involved in some cases where Plaintiff was a defense attorney.[38] However, because Plaintiff has alleged false testimony from the prior proceedings that would be material to a finding of probable cause for purposes of

---

[36] "It is clear from Conley's deposition that Knight was paid in 2010, prior to Womack's trial of March 3, 2011." (Docket No. 112, Page 7.)

[37] The Court notes that at the preliminary hearing Judge Robert Soder had a copy of the *entire* video and the editing was brought to his attention. Plaintiff was also made aware of the editing of the video at the preliminary hearing and failed to make any objections. In any event, the Court has viewed the video and finds it is not conclusive as to either side's story. Accordingly, it would not be material to any probable cause determination even if edited.

[38] The Court also finds that any "failure to disclose" animosity toward Plaintiff was not material to a finding of probable cause. Arguably, such an omission wouldn't even be a false statement given its subjective nature. In any event, at the grand jury proceeding Zack Womack advanced this theory when he testified that there was animus between Plaintiff and Conley.

the arrest/seizure claim, the Court finds the claim is not tentatively barred based on a presumption of probable cause from the prior proceedings.

  b.  Viability of Unreasonable Entry/Search Claim

The Court has not found any meaningful distinction in precedent between houses and businesses, so will analyze the current situation under the typical Fourth Amendment framework:

> The Court long has recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes. *New York v. Burger,* 482 U.S. 691, 699 (1987). Just like private residences, a search of commercial premises is presumptively unreasonable if conducted without a warrant. *See v. City of Seattle,* 387 U.S. 541, 543 (1967); *see also, Marshall v. Barlow's, Inc.,* 436 U.S. 307, 311 (1978).

*Williams v. Com.*, 213 S.W.3d 671, 675 (Ky. 2006). Defendants' argue that an actual "search" did not take place because Plaintiff: (1) did not demand Conley/Ingram to get a warrant, (2) voluntarily handed over the pills, and (3) was not actually searched. (Docket No. 89, Page 20-22.)  The Court disagrees.  Even accepting those assertions as true, it is still beyond dispute that Conley and Ingram entered both Plaintiff's commercial building and his individual office without Plaintiff's permission.

However, as discussed above, besides the conclusory allegations of a conspiracy between Defendants to violate Plaintiff's constitutional rights, presumably by planting drugs in his office, Plaintiff has not produced any evidence that would permit a reasonable jury to conclude that Conley, Ingram, and Knight did not have probable cause to enter his place of business.  The prior recorded conversations and testimony by

Conley/Knight about the telephone call confirming Plaintiff had taken possession of the drugs gave Conley and Ingram probable cause to enter Plaintiff's law office. While Plaintiff makes a conclusory allegation that the phone call was for the purposes of instructing Knight to throw the drugs on his desk while he was not looking, he has no direct knowledge of the content of that call and has not brought forth any evidence that would support this allegation. Accordingly, the Court will **GRANT** Conley, Knight, and Ingram's motion for summary judgment on the Fourth Amendment § 1983 claim for an unreasonable entry/search.

    c. Viability of Unreasonable Seizure/Arrest Claim

As for the unreasonable seizure/arrest claim, the factual issue Plaintiff has identified here, whether the drugs were thrown while he was not looking, and the record giving rise to this issue, was presented and decided at the grand jury proceeding. Normally, the accusation of a false statement material to the finding of probable cause would be sufficient to overcome the presumption of probable cause from that proceeding. However, at the grand jury proceeding Zack Womack presented the same theory Plaintiff advances now: Plaintiff was set up and the drugs were planted on his desk through a conspiracy to frame Plaintiff based on animosity between Conley and Plaintiff.[39] Under similar circumstances, courts have found the same issue has already been litigated and the probable cause determination cannot be attacked. *See, e.g.,*

---

[39] Admittedly, the theory advanced is not completely the same because Zack Womack alleged the drugs were planted in an *open desk drawer* while Plaintiff alleges the drugs were planted *on his desk*. In any event, the distinction would not make a difference because Defendants testified Plaintiff produced the drugs by *opening* a desk drawer.

*Redmond v. Sanders*, 858 F. Supp. 2d 809, 816 (E.D. Mich. 2012); *Flowers v. City of Detroit*, 306 F. App'x 984, 985 (6th Cir. 2009).[40]

In any event, the Court would find even in the absence of this issue already having been decided Plaintiff's claim would fail. Plaintiff makes only a conclusory allegation that he was set up for purposes of arguing the seizure/arrest was unreasonable. As discussed above with respect to the conspiracy claim, this conclusory allegation is unsupported by any evidence. Given the prior recorded conversations, Knight's testimony that the drug transaction had been completed, and Conley/Ingram's statements a reasonable jury could not conclude that Defendants lacked probable cause to arrest/seize Plaintiff. Accordingly, the Court will **GRANT** Conley, Knight, and Ingram's motion for summary judgment on the Fourth Amendment § 1983 claim for an unreasonable arrest/seizure.

IV.    <u>Fourth Amendment § 1983 Claim for Deliberately Concealing Exculpatory Evidence, Continuing the Pre-Trial Deprivation of Liberty by Loss of Freedom of Actions due to Pending Criminal Charges</u>

The third Fourth Amendment claim is that Defendants Robert Shoultz, Jason Kirk, and Matt Conley deliberately concealed exculpatory evidence, continuing the pre-trial deprivation of liberty by loss of freedom of actions due to pending criminal charges.[41] The intentional suppression of impeachment and exculpatory evidence can

---

[40] "Issue preclusion bars the parties from relitigating any issue actually litigated and finally decided in an earlier action." *Yeoman v. Kentucky Health Policy Bd.,* 983 S.W.2d 459, 465 (Ky.1998). In order for issue preclusion to apply in Kentucky, (1) the issue in the second case must be the same as the issue in the first case, (2) the issue must have been actually litigated, (3) the issue must have been actually decided, and (4) the decision on the issue in the prior action must have been necessary to the court's judgment. *Stemler v. Florence*, 350 F.3d 578, 586 (6th Cir. 2003).

[41] "For most of the same reasons we have laid out here, virtually every other circuit has concluded either that the police share in the state's obligations under *Brady,* or that the Constitution imposes on the police

be the basis for both a Fourth and a Fifth Amendment violation.[42]  *Gregory v. City of Louisville*, 444 F.3d 725, 750-51 (6th Cir. 2006).  Although the *situs* of the injuries are distinct, a Plaintiff is entitled to pursue both theories of recovery:

> This Court agrees with the district court that Plaintiff's *Brady* and continued detention claims against Katz share a factual premise. This Court disagrees with the district court, however, that this similarity restricts Plaintiff to one theory of recovery over the other. The legal constructs of plaintiff's continued detention claim, which allege a Fourth Amendment violation, are distinct from a *Brady* claim, which alleges a due process violation. Plaintiff alleges *both* that **his detention was unlawfully continued due to Katz's failure to disclose exculpatory evidence (what Plaintiff and the district court term his "malicious prosecution" claim)** and that his right to a fair trial was abridged. The *situs* of injury is distinct and therefore Plaintiff should be able to pursue both legal theories. It is not the role of this Court to restrict Plaintiff's choice of viable legal theories. Other courts have allowed plaintiffs to pursue two legal theories under § 1983 premised on the same underlying facts. *See Atkins v. County of Riverside,* 151 Fed. App'x. 501, 505-06 (9th Cir. 2005) (unpublished opinion) (permitting plaintiff to pursue, simultaneously, both a fabrication of evidence claim and a *Brady* violation claim). (emphasis added.)

*Gregory*, 444 F.3d at 750-51.  *Gregory* spoke to what exactly this Fourth Amendment claim involved:

> While *Spurlock* restyled the cause of action for continued detention without probable cause in this Circuit, it did not establish a new constitutional right. Rather, *Spurlock* was responding to *Albright's* direction to change the legal analysis which courts apply to claims alleging a violation of the right. An investigative official had a duty both before and after *Albright* to refrain from engaging in acts

---

obligations analogous to those recognized in *Brady*."  *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009) (citations omitted).

[42] The Court notes this is a "clearly established right" as is required for qualified immunity to not apply:

> Although our recognition of this type of a claim is more recent and less specific, the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights.

*Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009).

> which continued a person's detention without probable cause. We held as much in *Spurlock* against the defendant's argument that the change in legal analysis somehow altered the defendant's duties. 167 F.3d at 1006. The *Spurlock* panel held that the right to be free of continued detention without probable cause was clearly established well before the 1993 events in question in the case at bar. *Id.* at 1006-07.

*Gregory v. City of Louisville*, 444 F.3d 725, 749-50 (6th Cir. 2006). "The liberty deprivations regulated by the Fourth Amendment are not limited to physical detention." *Murphy v. Lynn*, 118 F.3d 938, 945 (2d Cir. 1997). The Sixth Circuit has consistently held that nontestimonial, pretrial acts do not benefit from absolute immunity, despite any connection these acts might have to later testimony. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 739, 758 (6th Cir. 2006) (finding district court erred when it dismissed Plaintiff's Fourth Amendment claim against Defendant when he failed to disclose the victim of the alleged crime had actually picked out another photo as identifying the perpetrator).

    a.   Instances of Withholding of Allegedly Exculpatory Evidence

Plaintiff first alleges Defendants intentionally withheld exculpatory evidence at the preliminary hearing and grand jury by showing an edited audio/video of the "drug transaction." (Docket No. 98-2, Page 2.) The edited video version allegedly did not show Knight throwing the drugs on Plaintiff's desk while he was not looking or the phone call Knight received.[43] However, Defendant Conley has produced an affidavit of Todd P'Pool, who was the special prosecutor in Plaintiff's criminal case, stating it was his decision, not Conley's, to show the edited videotape at the preliminary videotape.

---

[43] The Court notes that at the preliminary hearing Judge Robert Soder had a copy of the *entire* video and the editing was brought to his attention. Plaintiff was also made aware of the editing of the video at the preliminary hearing and failed to make any objections. In any event, the Court has viewed the video and finds it does not support either side's story.

Furthermore, P'Pool states it was his, and not Conley's, decision to edit the videotape. (Docket No. 112-2.)

Plaintiff established, at least for purposes of defending a summary judgment motion, that the fact that Connie Knight was paid $300.00 by Matt Conley after the investigation was completed was deliberately withheld from the prosecutors.[44] (*See* Docket No. 98-1, Affidavit of William Norment – Defense Counsel to Womack, Number 8.)  However, as discussed above with respect to probable cause, the Court believes that even if Plaintiff, prosecutors, judges, and the grand jury were informed that Knight had been paid $300 as a result of her assistance, it would not have resulted in a different outcome—the charges would have still been pursued.[45]  Both Conley and Ingram testified that the drugs were found in the desk drawer and much of what Connie Knight testified to was independently verifiable through audio and video recordings. The only issue Knight testified about that wasn't independently verifiable was that Plaintiff had used her to previously purchase drugs.[46]

Nevertheless, Plaintiff has also alleged that Conley withheld the "delivery method" used in the investigation.  Essentially, Plaintiff is accusing Conley of (1) lying when he states the drugs were produced from Plaintiff's desk drawer; and (2) instructing Knight to throw the drugs on his desk while his back was turned.  The Court

---

[44] Defendant states that "disclosure of this payment information, as contained in the CI file, would be the prosecutor's responsibility, not that of Conley or the KSP."  (Docket No. 108, Page 4)  However the deposition of Matt Conley, at the very least, indicates there is a genuine dispute as to whether or not this information was ever actually turned over to the prosecution.  (*See* Docket No. 98-3, Page 74-86.)

[45] Defendants assert that Knight did not know she would get paid when she actually acted as a confidential informant.  Plaintiff does not appear to dispute this.

[46] Admittedly, it appears Matt Conley at least testified in a manner that made it appear as though Knight was not receiving anything for her assistance.  However, as discussed, that alone would not have impacted a finding of probable cause.

notes, however, that even if where the drugs were located when Ingram and Conley entered, whether on the desk or in his drawer, was withheld its disclosure would not have resulted in a different outcome. This is because, given all of the prior recorded conversations and Knight's statement that Plaintiff had taken possession of the drugs, Conley and Ingram would have had probable cause to arrest and/or seize Plaintiff. As for the accusation that Knight was instructed to throw the drugs on his desk while his back was turned, as discussed above with respect to the conspiracy claim, this is a conclusory allegation unsupported by any evidence. Plaintiff himself would have no direct knowledge of what was said in the phone conversation.[47] Accordingly, the Court will **GRANT** Matt Conley summary judgment on this Fourth Amendment claim.

As to Shoultz and Kirk, even assuming Plaintiff's conclusory allegation is true, there is no evidence that indicates they were aware of or authorized the "method of delivery." There is also no evidence that shows they would have been aware that Knight was instructed to throw the drugs on the desk. As a result, they could not have been expected to disclose this information to anyone and would not have been responsible for Plaintiff's continued deprivation of liberty. Accordingly, the Court will also **GRANT** Defendants Shoultz and Kirk summary judgment on this Fourth Amendment claim.

---

[47] As a sidenote, the Court notes that this claim may run afoul of *Rehberg's* announcement that absolute immunity for testimony may not be "circumvented" by claiming a witness conspired to present false testimony. To some degree it appears that may be what Plaintiff is attempting to do—alleging a conspiracy to present false testimony.

V.  <u>Fifth and Fourteenth Amendment §1983 Claims for Deliberately Concealing Exculpatory Evidence, Depriving Plaintiff of his Right to a Fair Trial</u>

Plaintiff also makes a claim under the Fifth and Fourteenth Amendment for deliberately concealing exculpatory evidence, depriving Plaintiff of his right to a fair trial against Robert Shoultz, Jason Kirk, and Matt Conley.[48]  For the same reasons discussed above, the Court will **GRANT** to Defendants Robert Shoultz, Matt Conley, and Jason Kirk on Plaintiff's Fifth and Fourteenth Amendment § 1983 claims for deliberate concealment of exculpatory evidence, depriving Plaintiff of his right to a fair trial.  The Court notes there is an additional basis upon which summary judgment could be granted because Plaintiff's claim is plainly not actionable.  Cases from the Sixth Circuit established that due process claims based on the wrongful suppression of exculpatory evidence are unavailable where, as here, the claimant was acquitted of his criminal charges.  *See, e.g., Offineer v. Kelly*, 454 F. App'x 407, 419 (6th Cir. 2011); *Lindsay v. Bogle,* 92 Fed. App'x. 165, 170 (6th Cir. 2004); *McCune v. City of Grand Rapids,* 842 F.2d 903, 907 (6th Cir. 1988).

VI.  <u>§1983 Supervisory Liability and Failure to Train Claims</u>

Plaintiff asserts a §1983 claim of supervisory liability against Defendants Robert Shoultz and Jason Kirk.  (Docket No. 98, Page 34.)  A "mere failure to act" is insufficient for purposes of establishing supervisory liability.  *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002).  The supervisory official must have encouraged the specific incident or in some other way directly participated in it:

---

[48] "For most of the same reasons we have laid out here, virtually every other circuit has concluded either that the police share in the state's obligations under *Brady,* or that the Constitution imposes on the police obligations analogous to those recognized in *Brady.*"  *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009) (citations omitted).

Allegations of *respondeat superior* do not sustain a § 1983 claim against state employees in their individual capacities, meaning that officials are personally liable for damages under that statute "only for their own unconstitutional behavior." *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989). That is, "even if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Cardinal v. Metrish*, 564 F.3d 794, 802-03 (6th Cir. 2009).

*Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010). "The Sixth Circuit directs that a plaintiff may maintain a failure to train or supervise claim when he proves the following: '(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Scherzinger v. Bolton*, 3:11-CV-00011-H, 2013 WL 3821734 (W.D. Ky. July 23, 2013) ((citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

Plaintiff has alleged Defendants approved actions in violation of General Orders. However, violation of General Orders alone would not amount to a constitutional violation. It appears Plaintiff has also alleged Shoultz and Kirk failed to train Conley on disclosing exculpatory evidence.[49] This inadequacy would implicitly be the result of the supervisor's deliberate indifference, as this would be a reoccurring situation for law enforcement. Finally, the inadequacy would be closely related to the injury. In fact, as to Kirk and Shoultz, Plaintiff has shown they are "oblivious" to the Constitutional requirements of *Brady* based on their depositions. (Docket No. 98, Page

---

[49] "I'm – I've never had anybody say we have to give exculpatory evidence. They may have put it in some other term but exculpatory evidence is not something I've used or heard anybody use." (Docket No. 98-3 Matt Conley's Deposition, Page 79.)

34-35.) So even if they wanted to properly supervise and train, they would not be competent to do so.

However, even assuming there was a complete and flagrant failure to train on disclosure of exculpatory evidence, the Court does not find a constitutional violation attributable to Kirk and Shoultz in this situation. As discussed above, the withholding of the payment to Connie Knight did not amount to a Constitutional violation. And even assuming Plaintiff's conclusory allegations of a conspiracy and subsequent withholding of the "delivery method," the Court does not find such withholding attributable to a lack of training on exculpatory evidence. While clearly it would be "exculpatory evidence," any police officer would be well aware that what is essentially a framing of an alleged criminal would, by the letter of the law, be something necessarily should be disclosed—regardless of the training they did or did not receive. This is not a situation where training would have helped because it is an alleged framing which by its very nature is completely exculpatory. Simply even if there was a framing no amount of supervision or training would have prevented the violation. Therefore, the Court will **GRANT** Defendant Kirk and Shoultz's motion for summary judgment on the supervisory liability claim.

VII.    Qualified Immunity For Federal (§1983) Claims

In federal civil rights actions seeking money damages, government officials performing discretionary functions are entitled to qualified immunity so long as their acts do not violate clearly established statutory or constitutional rights of which a reasonable officer would be aware:

> We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Messerschmidt v. Millender*, 132 S.Ct. 1235, 1244 (2012).   The Court appreciates that implicit in the qualified immunity doctrine is the recognition that governmental officials, acting reasonably, may err.   *Dunigan v. Noble,* 390 F.3d 486, 492 (6th Cir. 2004).   The concept of immunity acknowledges that it is better to risk some error and possible injury from such error than not to decide or act at all.   *Id.* There are several steps to a qualified immunity analysis.

The first step in a qualified immunity analysis is a consideration of whether taking the facts in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right?"   *Id.* (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)).   If the facts do not show their conduct violated constitutional rights, then the officers are entitled to qualified immunity.   As discussed above, the Court finds even taking the facts in the light most favorable to Plaintiff he has not shown, other than by conclusory allegations unsupported by evidence, that the Defendants' conduct violated his constitutional rights.   Accordingly, the Court would alternatively **GRANT** summary judgment to Defendants' on all federal law § 1983 claims on the basis of qualified immunity.

   a.   Significance of General Orders of KSP With Respect to Qualified Immunity

Plaintiff has alleged that the existence of the General Orders change the Defendants' actions from "discretionary" to "ministerial."    Accordingly, if the

Defendants' actions were ministerial, qualified immunity would not even be available.

Plaintiff's response to Defendants' motions for summary judgment states:

> Qualified official immunity is only relevant when a state employee is sued in his or her individual capacity and the act performed is one that is discretionary in nature. 'Discretion in the performance of an act occurs when the act may be performed in one of two or more ways, either of which would be lawful, and the state actor has the will or judgment to determine the performance.' *Upchurch v. Clinton County*, 330 S.W.2d 428, 430 (Ky. 1959). In contrast, ministerial acts (functions without immunity) are those that require 'only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts. This is precisely where these officers' absolute obligation to comply with the General Orders of the Kentucky State Police Commission becomes pertinent.

(Docket No. 98, Page 27.)

Essentially, Plaintiff alleges that the existence of the General Orders change the applicable Defendant's actions from "discretionary" to "ministerial." Accordingly, qualified immunity would not even be *available*. On the other hand, Defendants argue the General Orders were not applicable. The Court finds this issue is irrelevant because, as held above, Plaintiff has not shown that Defendants' conduct violated his constitutional rights.[50]

---

[50] The Court notes that that whether or not a violation of the General Order results in a forfeiture of qualified immunity is a difficult issue it need not resolve:

> Appellee urges as well that appellants' violation of the personnel regulation constituted breach of their ministerial duty established by the regulation to follow various procedures before terminating appellee's employment. Although the decision to discharge an employee clearly is discretionary, appellee reasons that the Highway Patrol regulation deprived appellants of all discretion in determining what procedures were to be followed prior to discharge. Under this view, the Harlow standard is inapposite because this Court's doctrine grants qualified immunity to officials in the performance of discretionary, but not ministerial, functions.

Relatedly, the Court notes a violation of a KSP General Order does not in and of itself amount to a constitutional violation. *See, e.g., Commonwealth v. Bothman*, 941 S.W.2d 471, 474 (Ky. Ct. App. 2006). Essentially, Plaintiff must still show a Constitutional right was violated, regardless of whether a KSP General Order was violated. To the extent Plaintiffs' claims are based solely upon the allegation that Defendants violated a KSP General Order, they will fail.

## **State Law Claims**

I.  Malicious Prosecution – State Law Claim

Plaintiff asserts a state law claim of malicious prosecution only against Defendant Matt Conley. (Docket No. 181.) Generally, there are six basic elements necessary to the maintenance of an action for malicious prosecution under Kentucky state law: "(1) the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings, (2) by, or at the instance,

---

> Appellee's contention mistakes the scope of the ministerial duty exception to qualified immunity in two respects. First, as we have discussed, breach of a legal duty created by the personnel regulation would forfeit official immunity only if that breach itself gave rise to the appellee's cause of action for damages. This principle equally applies whether the regulation created discretionary or ministerial duties. Even if the personnel regulation did create a ministerial duty, appellee makes no claim that he is entitled to damages simply because the regulation was violated. See supra, at 3019, and n. 12.
>
> In any event, the rules that purportedly established appellants' ministerial duties in the present case left to appellants a substantial measure of discretion. Cf. Amy v. The Supervisors, 11 Wall. 136, 138, 20 L.Ed. 101 (1871); Kendall v. Stokes, 3 How. 87, 98, 11 L.Ed. 506, 833 (1845). Appellants were to determine, for example, what constituted a 'complete investigation'• and a 'thorough' study of all information• sufficient to justify a decision to terminate appellee's employment. *See* n. 6, supra. And the District Court's finding that appellants ignored a clear legal command does not bear on the ministerial• nature of appellants' duties. A law that fails to specify the precise action that the official must take in each instance creates only discretionary authority; and that authority remains discretionary however egregiously it is abused. Cf. Kendall v. Stokes, supra.

*Davis v. Scherer*, 468 U.S. 183, 196 n. 14 (1984); *but see Washington v. Starke*, 855 F.2d 346, 349-50 (6th Cir. 1988) (implying officials do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision).

of the plaintiff, (3) the termination of such proceedings in defendant's [here in Plaintiff's] favor, (4) malice in the institution of such proceeding, (5) want or lack of probable cause for the proceeding, and (6) the suffering of damage as a result of the proceeding."[51] *Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981). Because Kentucky law is historically antagonistic toward allegations of malicious prosecution, *see Broaddus v. Campbell*, 911 S.W.2d 281, 285 (Ky. Ct. App. 1995) (citing *Reid v. True*, 302 S.W.2d 846 (Ky. 1957)), one must strictly comply with the prerequisites of maintaining an action for malicious prosecution. *Raine*, 621 S.W.2d at 899. Defendant Conley only appears to dispute that the elements of probable cause and malice are not met. (Docket No. 89, Page 29.)

a. Probable Cause

A malicious prosecution claim also requires there be a lack of probable cause for a proceeding. As discussed above with respect to the Fourth Amendment claims, a reasonable jury could not conclude that probable cause was lacking. Plaintiff makes only a conclusory allegation of a conspiracy to frame unsupported by evidence. Given the prior recorded conversations, Knight's testimony that the drug transaction had been completed, and Conley/Ingram's testimony, a reasonable jury could not conclude there was not probable cause for the proceeding.

---

[51] In Kentucky, a plaintiff in a malicious prosecution action may recover for humiliation, mortification and loss of reputation. *Raine v. Drasin*, 621 S.W.2d 895, 900 (Ky. 1981) (citing *Hayes v. Ketron*, 223 Ky. 119, 3 S.W.2d 172 (1928)). Plaintiff has sufficiently provided expert testimony that would allow a reasonable jury to conclude he suffered damage as a result of the proceedings.

b.  Malice

"Malice is the intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose." *Stearns Coal Co. v. Johnson*, 37 S.W.2d 38, 40-41 (Ky. 1931) (citations omitted).  The question of malice is one for the jury.  *Id.* Admittedly, there is evidence and testimony available that tends to indicate Matt Conley at the very least had a reason to dislike Plaintiff.  This proof could lead a jury to believe Conley's behavior was premised on motivations other than Plaintiff's alleged criminal behavior.  However, this is irrelevant because there was not a lack of probable cause for the proceeding.  One must strictly comply with the prerequisites of maintaining an action for malicious prosecution.  *Raine*, 621 S.W.2d at 899.  Accordingly, because there was probable cause for the proceedings, the Court will **GRANT** Defendant Matt Conley summary judgment on the state law malicious prosecution claim.

II.    Defamation Claims Against Defendant Stephanie Conley

The Court previously dismissed Plaintiff's defamation claim against all Defendants in their individual capacities, except Defendant Stephanie Conley.  (Docket No. 29.)  Under Kentucky law, four elements are necessary to establish a claim for defamation: "(1) defamatory language; (2) about the plaintiff; (3) which is published; and (4) which causes injury to reputation." *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 736 (Ky. Ct. App. 2004) (citing *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981)); *see also Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004).  Truth is a complete defense, so a defendant able to prove the truth of a defamatory statement at issue cannot be held liable for defamation.  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795-96 (Ky. 2004).  Words that are falsely spoken or

written are libelous per se (therefore damages don't have to be proven), if they impute unfitness to perform the duties of an office or employment, or if they prejudice a person in his profession or trade. *Louisville Taxicab & Transfer Co. v. Ingle*, 229 Ky. 578, 17 S.W.2d 709, 710 (1929) (citations omitted).

### a. Defamation Claims Premised on Filing of a Bar Complaint

Previously, this Court declined to grant Stephanie Conley's motion to dismiss for defamation based on a frivolous bar complaint because a Kentucky Supreme Court case entitling Conley to absolute immunity for this claim was not yet final or binding. That case is now final and binding. *Morgan & Pottinger, Attorneys, P.S.C. v. Botts*, 348 S.W.3d 599, 605 (Ky. 2011) ("Accordingly, we hold today that any communication or statement made to the KBA during the course of a disciplinary hearing or investigation, including the contents of the bar complaint initiating such proceedings, are absolutely privileged."). Furthermore, Plaintiff appears to concede that Conley was privileged in the context of the filing of a bar complaint.[52] Accordingly, the Court will **GRANT** summary judgment to Stephanie Conley and dismiss the defamation claim premised on the filing of the bar complaint.

### b. Defamation Claims Based on Showing of Bar Complaint to Supervisor and Alleged Statement to Plaintiff's Client

Plaintiff additionally alleges defamation occurred when she published the defamatory language to her supervisor and a co-worker.[53] (Docket No. 98, Page 35-36.)

---

[52] "While her libel may be privileged in the context of a bar complaint, . . ." (Docket No. 98, Page 35.)

[53] This allegation is supported by Stephanie Conley's deposition. Conley admits she showed the contents of the bar complaint to her supervisor Kelly Shaw. She also states she believed she discussed the contents of the complaint with another social worker, Jennifer Burke, who was in the office when she was discussing it with her supervisor. Additionally, she had discussions about the complaint with her husband Matt Conley.

Plaintiff also appears to allege, in his answer to interrogatories, that Conley "spoke to two of my clients without my permission and made similar defamatory statements to them." [54] (Docket No. 90-1, Page 3.) Notably, as to the allegations that Conley spoke to two of Plaintiff's clients, Plaintiff did not mention this allegation or respond to Conley's arguments in his response to her motion for summary judgment. (Docket No. 98, Page 35-36.)

Defendant Conley argues these additional defamation claims should fail because Plaintiff has failed to amend his pleadings and initial disclosures. (Docket No. 90, Page 4-5.) Additionally, Plaintiff has failed to disclose any witnesses in regards to the additional defamation claims against Stephanie Conley and has still not requested leave to amend his Rule 26 disclosures. The relevant portions of the Complaint state as follows:

FACTS
* * *

44. Defendant Stephanie Conley filed a frivolous bar complaint against Plaintiff which was summarily dismissed.

* * *
COUNT 3
Pendant State Law Claims

67. The conduct of Defendant Stephanie Conley constitutes the tort of defamation within the meaning of the common law of the Commonwealth of Kentucky.

---

[54] The only actual evidence of this allegation appears to be some sort of case note:

> Interview with Tonya Benson and Nicole Wade. Ms. Benson stated that Ms. Stephanie Conley told her the only reason Dax Womack was involved in her case was because of her husband having busting him for drugs. Evidently Ms. Conley had spoken with Ms. Benson since the event because Dax was not her attorney at the time of the removal of the children.
>
> This may establish a clear and unequivocal punitive on the part of Ms. Conely.

(Docket No. 90-2.) Plaintiff has not expanded on this argument, other than the production of this evidence and his brief allegation in the answer to an interrogatory.

68. That upon information and belief, all of the named Defendants have defamed the Plaintiff concerning the incidents that are involved herein.

(Docket No. 1.) This language is sufficient to incorporate the Plaintiff's "new" defamation claim, but Defendant Conley is correct that no facts were pled concerning that claim. However, the parties seemed to have proceeded as though the claims were properly pled. There is no prejudice to reviewing the claims as though pled.

However, even if the Court were to find these new defamation claims were allowed, Stephanie Conley asserts the showing of the bar complaint to her supervisor is barred by privilege:

> Q: And, again, could you explain why you took it to your supervisor?
> A: She was my supervisor. I wanted to take it to her and just let her know what I'm doing in case there was an issue with a social worker filing a complaint. As my supervisor I wanted her to be aware of what I was doing.
> Q: And within the body of the complaint did you indicate your employment with the Cabinet for Health Services?
> A: Yes.
> Q: So the reason you took it to your supervisor was just to let her know that you were going to file this complaint and reference your employment in – in the complaint?
> A: Yes
> Q: Did you otherwise discuss the contents of the complaint with your supervisor?
> A: No.
> Q: So you simply showed her the Bar complaint you intended to file?
> A: Yes.

(Docket No. 90-3, Page 59-60.) Plaintiff asserts the only reason she brought this to her supervisor's attention is because she wanted her supervisor to be aware of what she was doing. (Docket No. 90, Page 5-6.) Essentially, Plaintiff implies it was necessary to file

the bar complaint, and therefore an absolute privilege exists.[55] (Docket No. 111, Page 3-4.) Similarly, Plaintiff also alleges a qualified privilege exists because it was an internal communication made in the employment context. *See Toler v. Sud-Chemie, Inc.*, 2009-CA-001686-MR, 2011 WL 744515, *7-8 (Ky. Ct. App. Mar. 4, 2011).

Plaintiff has not responded to these arguments or attempted to distinguish the precedent cited by Defendant, other than just generally stating "[t]here is no privilege to shield her from liability for that slanderous conduct." (Docket No. 98, Page 35-36.) Accordingly, the Court holds the showing of the bar complaint to her supervisor, and any contemporaneous disclosure to a co-worker, is protected by an absolute privilege because Defendant Stephanie Conley asserts it was necessary for the filing of the bar complaint and Plaintiff has not taken issue with that assertion. Therefore, the Court will **GRANT** Defendant Stephanie Conley summary judgment on the defamation claim premised on the showing of the bar complaint to her supervisor and any contemporaneous disclosure to a co-worker.[56]

As for the statements allegedly made to Plaintiff's clients, the Court notes it is not even clear if Plaintiff is still pursuing this claim as his proposed jury instructions contain no reference to it. (Docket No. 168, Page 15.) In any event, the only actual

---

[55] "From all of this, we must conclude that Kentucky would in the proper case apply the absolute privilege to communications by a party made preliminary to a seriously considered judicial proceeding. The conclusion is informed by Kentucky's historical acceptance of the absolute privilege, Kentucky's citation to provisions of the *Restatement* which recognize that the privilege applies to communications preliminary to a proposed judicial proceeding, and the persuasiveness of the *Restatement* itself as an indicator of the 'majority rule.'" *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1127 (6th Cir. 1990).

[56] Relatedly, Stephanie Conley, a social worker, also argues that privilege exists because this was an action by an officer in execution of a public duty, analogizing to police officers having privilege in communications undertaken with other officers in execution of a public duty. (Docket No. 90, Page 6.) Conley also claims Plaintiff's defamation claim fails as a matter of law because the statements were not defamatory and, separately, were otherwise truthful. (Docket No. 90, Page 7.) Because the Court holds that Stephanie Conley was entitled to an absolute privilege, these arguments need not be addressed.

evidence of such statements, other than Plaintiff's general assertions in his answer to an interrogatory, is a statement taken by an unknown individual in what appears to be some type of case note:

> Interview with Tonya Benson and Nicole Wade. Ms. Benson stated that Ms. Stephanie Conley told her the only reason Dax Womack was involved in her case was because of her husband having busting him for drugs. Evidently Ms. Conley had spoken with Ms. Benson since the event because Dax was not her attorney at the time of the removal of the children.
> This may establish a clear and unequivocal punitive on the part of Ms. Conely.

(Docket No. 90-2.) Defendant Conley contends this statement is not defamatory and, in any event, it is truthful. Additionally, Conley argues Plaintiff has failed to prove damages, which Conley argues are required in this context and Plaintiff does not appear to disagree, from the alleged statement made to Tonya Benson. Notably, Plaintiff has not responded to these arguments or even brought up this defamation claim in his response. (Docket No. 98, Page 35-36.) The Court agrees with Conley that this alleged statement is not defamatory and, in any event, Plaintiff has not shown any damages from this statement. Accordingly, the Court will **GRANT** Defendant Stephanie Conley summary judgment on the defamation claim premised on alleged statements to Plaintiff's clients.

III.   Qualified Official Immunity for State Law Claims

Matt Conley argues he falls under the purview of qualified official immunity protection as an agent of the government for purpose of state law claims. *Yanero* establishes the standard for qualified official immunity under Kentucky state law:

> Qualified official immunity (what officers enjoy when sued in their individual, rather than official, capacities) applies to negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority.

*Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). It is not disputed that Conley was "public officer or employee of," thereby *tentatively* making qualified official immunity *available*. Furthermore, all of the actions at issue would be "discretionary acts or functions" and "within the scope of the employee's authority." However, as discussed above, the only state law claim asserted against him, malicious prosecution, fails because no reasonable jury could conclude there was a lack of probable cause for the proceeding based on the evidence in the record.

## **CONCLUSION**

Although the Court has dismissed all claims, other comments are appropriate. Charges were brought against Plaintiff and he was found not guilty. Plaintiff always professed his innocence and it was confirmed by a jury.

Plaintiff thinks he was framed. The Court does not doubt his good faith suspicion. However, other than suspicion and some innuendo, it simply is not supported by the record. The officers were provided information of a drug buy. The evidence shows they investigated the accusations as would be expected. It appears to be a sad case of a defense attorney doing what he could to defend his client and get the best deal he could for his client and police officers also in good faith investigating accusations in a case where there was probable cause. But we all know probable cause does not equal guilt.

In the end, other than speculation and suspicion, there was not sufficient evidence to support a conspiracy and other claims asserted. Counsel for all sides were zealous advocates for their clients. The Court appreciates the good effort and work of all counsel.

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED as follows:

(1) **IT IS HEREBY ORDERED** that Matt Conley's motion for summary judgment, (Docket No. 89), is **GRANTED**. The remaining claims against Matt Conley in his individual capacity are dismissed.

(2) **IT IS HEREBY ORDERED** that Robert Shoultz and Jason Kirk's motion for summary judgment, (Docket No. 87), is **GRANTED.** The remaining claims against Shoultz and Kirk in their individual capacities are dismissed.

(3) **IT IS HEREBY ORDERED** that David Crafton and Scott Ingram's motion for summary judgment is **GRANTED**. The remaining claims against David Crafton and Scott Ingram in their individual capacities are dismissed.

(4) **IT IS HEREBY ORDERED** that Connie Knight's motion for summary judgment, (Docket No. 83), is **GRANTED.** The remaining claims against Connie Knight in her individual capacity are dismissed.

(5) **IT IS HEREBY ORDERED** that Stephanie Conley's motion for summary judgment on the remaining state law claim of defamation against her in her individual capacity, (Docket No. 90), is **GRANTED**. The defamation claim is dismissed.

IT IS SO ORDERED.

Date:

cc:      Counsel